UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,

       -against-                             S1 05 Crim. 0888 (LAK)

JEFFREY STEIN, et al.,

                  Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

| | |
|---|---|
| Justin S. Weddle | Robert S. Fink |
| Kevin M. Downing | Caroline Rule |
| Stanley J. Okula, Jr. | KOSTELANETZ & FINK, LLP |
| Margaret Garnett | *Attorneys for Defendant Richard Smith* |
| Assistant United States Attorneys | |
| MICHAEL J. GARCIA | George D. Niespolo |
| UNITED STATES ATTORNEY | DUANE MORRIS LLP |
| | *Attorneys for Defendant Randy Bickham* |
| Michael S. Kim | |
| Leif T. Simonson | James R. DeVita |
| KOBRE & KIM LLP | BRYAN CAVE LLP |
| *Attorneys for Defendant Mark Watson* | John A. Townsend |
| | TOWNSEND & JONES LLP |
| Ronald E. DePetris | *Attorneys for Defendant Carol Warley* |
| Marion Bachrach | |
| Dana Moskowitz | John R. Wing |
| DEPETRIS & BACHRACH, LLP | LANKLER SIFFERT & WOHL LLP |
| *Attorneys for Defendant Philip Wiesner* | Diana D. Parker |
| | *Attorney for Defendant Larry DeLap* |
| John F. Kaley | |
| DOAR RIECK KALEY & MACK | Russell M. Gioiella |
| *Attorneys for Defendant Steven Gremminger* | Richard M. Asche |
| | LITMAN, ASCHE & GIOIELLA, LLP |
| Susan R. Necheles | *Attorneys for Defendant Carl Hasting* |
| HAFETZ & NECHELES | |
| *Attorneys for Defendant Richard Rosenthal* | |

Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The Thompson Memorandum . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The February 25, 2004 Meeting Between the KPMG and the USAO . . . . . . . . . . . . . . . . 4

    KPMG Gets the Message . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    The Proffers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    KMPG's Claims that It Successfully Pressured Employees to Talk . . . . . . . . . . . . . . . . 11

Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    I.     As the Failure to Make this Motion Earlier Was a Product of Excusable Neglect, the Court On Its Own Motion Extends the Time Within Which to Make It to the Date of its Filing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    II.    The Voluntariness of the Statements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.     Messrs. Bickham, DeLap, Gremminger, Hasting, Rosenthal, and Wiesner and, With Respect to Her First Proffer, Ms. Warley, Did Not Offer Evidence that, If Credited, Would Be Sufficient to Warrant a Finding that Those Statements Were Coerced. Their Motions With Respect to These Statements Are Denied. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.     The Proffer Statements Made by Messrs. Smith and Watson Were Coerced. Those Made By Ms. Warley In Her Second Proffer Were Not. . . . . . . . . 23

            1.    Mr. Smith . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

            2.    Mr. Watson . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

            3.    Ms. Warley . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    III.    The Actions of KPMG in Coercing these Statements Are Attributable to the Government. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Lewis A. Kaplan, *District Judge.*

Our forefathers adopted an adversary system of justice – one in which no person may be convicted of a crime unless the government sustains its burden of convincing a jury beyond a reasonable doubt of a defendant's guilt. Part and parcel of that system is the principle that no one may be compelled, in a criminal case, to be a witness against one's self.

KPMG, the accounting giant, and many of its personnel found themselves under criminal investigation for their role in allegedly abusive tax shelters. An indictment, regardless of whether KPMG was guilty of anything, almost certainly would have meant the demise of the firm – the fate met by its competitor, Arthur Andersen & Co., when it was indicted in the Enron scandal.

Although KPMG long had paid legal fees for any of its employees[1] who were sued or charged with crimes as a result of doing their jobs, the government threatened to consider such payments as a factor weighing in favor of indicting the firm. It threatened also to consider any failure by KPMG to cause its employees to make full disclosure to the government as favoring indictment. So KPMG changed its practice regarding legal fees. It informed employees that it would pay fees, up to $400,000, but only on the condition that they cooperate with the prosecutors. In other words, KPMG told its personnel that it would cut off payment of legal expenses of any employee who refused to talk to the government or who invoked the Fifth Amendment. And it made crystal clear that it would cut off any payments of legal fees to anyone who was indicted.

The government took full advantage. It sought interviews with many KPMG employees and encouraged KPMG to press the employees to cooperate. Indeed, it urged KPMG to tell employees to disclose any personal criminal wrongdoing. When individuals balked, the prosecutors told KPMG. In each case, KPMG reiterated its threat to cut off payment of legal fees

---

[1]  The Court includes partners in the term "employees" for ease of expression.

unless the government were satisfied with the individual's cooperation. In some cases, it told the employees to cooperate with prosecutors or be fired.

The government obtained statements, commonly known as proffers, from nine KPMG employees who now are defendants here (the "Moving Defendants").[2] The Moving Defendants[3] contend that their statements were coerced in violation of their Fifth Amendment privilege against self-incrimination. They move to preclude the government from using the statements or any evidence derived therefrom.

Having considered the evidence, the Court is persuaded that the government is responsible for the pressure that KPMG put on its employees. It threatened KPMG with the corporate equivalent of capital punishment. KPMG took the only course open to it. In the words of its chief legal officer, KPMG did everything it could "to be able to say at the right time and with the right audience, we're in full compliance with the Thompson Memorandum."[4] It exerted substantial pressure on its employees to waive their constitutional rights.

In this case, not all of the statements made by the Moving Defendants to the government were coerced. Those that were, however, must be suppressed.

---

[2] Gov. Mem. [docket item 569] 5; Defs. Rep. Mem. [docket item 586] 1 n.1.

[3] The Moving Defendants are Messrs. Bickham, DeLap, Gremminger, Hasting, Rosenthal, Smith, Watson, and Wiesner and Ms. Warley.

[4] Docket item 544, Ex. B, at 74-75.

*Facts*

In *Stein I*,[5] the Court granted in part the motion of the KPMG Defendants for relief based on their contention that the provision of the Thompson Memorandum dealing with advancement of legal fees by corporate employers, both alone and coupled with the actions of the United States Attorney's office (the "USAO"), violated their Fifth and Sixth Amendments rights because it caused KPMG to cut off the payment of legal fees upon indictment. The present dispute concerns events prior to the indictment, but it arises out of much the same events. Accordingly, the Court assumes familiarity with *Stein I*, relies on the evidence adduced in the evidentiary hearing and the findings made on that motion, and elaborates on the prior findings only to the extent that additional findings are necessary. The Court has had the benefit also of a further evidentiary hearing on the present motion.

*The Thompson Memorandum*

The nature and background of the Thompson Memorandum have been explained previously.[6] We are concerned here, however, not only with its provision concerning advancement of legal fees to employees of business entities, which was described in detail in *Stein I*, but with another provision as well.

One of the guiding principles set forth in the Thompson Memorandum is that "[i]n gauging the extent of the corporation's cooperation [for purposes of determining whether it should be indicted], the prosecutor may consider the corporation's willingness to identify the culprits within

---

[5]     *United States v. Stein,* No. S1 05 Crim. 0888 (LAK), 2006 WL 1735260 (S.D.N.Y. June 26, 2006).

[6]     *Id.* at * 2-3.

the corporation, including senior executives, *to make witnesses available,* to disclose the complete results of its internal investigation, and to waive attorney-client and work-product privileges."[7]  The commentary goes on to elaborate on the meaning of cooperation in relevant part by stating:  "One factor the prosecutor may weigh in assessing the adequacy of a corporation's cooperation is the *completeness of its disclosure* including, if necessary, a waiver of the attorney-client and work product protections . . ."[8]  Thus, the Thompson Memorandum makes clear that the failure of a business organization facing possible indictment to induce its personnel to submit to interviews by the government and to disclose whatever they know may be a factor weighing in favor of indictment of the entity.

*The February 25, 2004 Meeting Between the KPMG and the USAO*

We may pass briefly over the initial interactions between KPMG and the USAO, as the Court's findings concerning them are set forth in *Stein I.*  Suffice it to say for present purposes that the prosecutors and KPMG attorneys met on February 25, 2004.  The KPMG lawyers were well aware of the Thompson Memorandum.  In any case, it was drawn forcefully to their attention by the USAO early in the meeting, in the context of a discussion concerning KPMG's intentions with respect to payment of employee legal fees, by the senior prosecutor present.

The KPMG lawyers made clear to prosecutors that KPMG believed that an indictment would be fatal to the organization.  They said that KPMG intended to cooperate in order to save the firm and that it would not protect individual employees.  Later in the meeting, Robert Bennett and

---

[7]  U.S. Dep't of Justice, United States Attorneys' Manual, Criminal Resource Manual, § 9-162, § VI, ¶ A (emphasis added).

[8]  *Id.* § VI, ¶ B (emphasis added).

Kenneth Bialkin of Skadden, Arps, Slate, Meagher & Flom, the senior lawyers representing KPMG, told the USAO that KPMG's "common practice" had been to pay legal fees for employees in connection with legal matters arising out of their doing their jobs. Although KPMG still was checking on its legal obligations, they said, it would not pay legal fees for employees who declined to cooperate with the government, or who took the Fifth Amendment, as long as it had discretion to take that position.[9] Mr. Bennett made clear also that KPMG would recommend to individual employees "lawyers who understand cooperation is the best way to go in this type of case." He expressed also the view that "it [wa]s in the best interests of KPMG for its people to get attorneys that will cooperate with" the government.[10]

*KPMG Gets the Message*

Shortly after the February 25, 2004 meeting, Mr. Bennett got back to Justin Weddle, one of the prosecutors, on the legal fee issue. He reported that KPMG did not think it had any binding legal obligation to pay employee legal fees,[11] but that "it would be a big problem" not to do so because the firm was a partnership. He said that KPMG was planning on putting a cap, or limit, on fees and conditioning their payment for any given partner or employee on that individual "cooperating fully with the company and the government."[12] Apparently satisfied with the government's response, KPMG began to implement the policy.

---

[9]     K313; U105; U116 ¶¶ 24-25; Tr., May 8-10, 2004 hearing ("Tr. I ") (Neiman) 273:13-17; *id.* (Pilchen) 24:6-19.

[10]    U106.

[11]    As noted previously, KPMG was blatantly self-interested on this point. *Stein I,* 2006 WL 1735260, at *7 & nn. 54-55.

[12]    U30.

On March 4, 2004, Mr. Pilchen of Skadden spoke to Mr. Townsend, an attorney for defendant Carol Warley. He told Townsend that KPMG wanted to pay Ms. Warley's attorneys' fees but that the government did not want it to do so.[13] In consequence, KPMG was "doing a balancing act" – it would "advance something . . . provided that Ms. Warley cooperated . . . with the government."[14] He made clear that no fees would be paid if Ms. Warley invoked her Fifth Amendment privilege.

On March 11, 2004, the Skadden team had a conference call with the USAO. Mr. Bennett assured the USAO that KPMG would be "as cooperative as possible" so that the office would not exercise its discretion to indict the firm. Mr. Weddle urged that KPMG tell its people to be "totally open" with the USAO, "even if [that meant admitting] criminal wrongdoing." He commented that this would give him good material for cross-examination.[15]

The Thompson Memorandum and the actions of the USAO had the desired effect. On the same date, Skadden's Mr. Rauh wrote to the USAO, enclosing among other things a form letter that Skadden was sending to counsel for the KPMG Defendants then employed by KPMG who had received subject letters from the government or otherwise appeared to be under suspicion.[16] The form letter stated that KPMG would pay an individual's legal fees and expenses, up to a maximum of $400,000, on the condition that the individual "cooperate with the government and . . . be prompt, complete, and truthful."[17]

---

[13]     Tr., July 19-20, 2006 hearing ("Tr. II") (Townsend) 70:22-25; *see also* DX WH-3.

[14]     Tr. II 70:25-71:3; *see also* DX WH-3.

[15]     K318-19; Tr. I (Michael) 45:22-50:12.

[16]     K5-16.

[17]     *Id.* at15-16.

*The Proffers*

The KPMG lawyers met again with the USAO on March 29, 2004.  In an effort to demonstrate that KPMG was cooperating, Skadden asked the government to notify it if any current or former KPMG employee refused to meet with prosecutors or otherwise failed to cooperate.[18]

The general course of subsequent events was described in *Stein I.*  As the focus here, however, is on the question whether the proffer statements of specific individuals were coerced, it is necessary to examine the circumstances relating to them in more detail.

As noted, each of the Moving Defendants received the form letter that stated that KPMG would pay an individual's legal fees and expenses, up to a maximum of $400,000, on the condition that the individual "cooperate with the government and . . . be prompt, complete, and truthful."[19]  Each subsequently made proffers[20] to the government pursuant to the USAO's standard

---

[18] U32; *see also, e.g.,* K30; K43.

[19] Counsel for Bickham, DeLap, Hasting, Smith, Warley, and Wiesner each received letters dated March 11, 2004.  K160-61 (Bickham); K162-63 (DeLap); K168-70 (Hasting); K177-78 (Smith); K179-80 (Warley); K183-84 (Wiesner). Counsel for Watson and Gremminger received letters dated March 15, 2004 and November 5, 2004, respectively.  K181-82 (Watson); K166-67 (Gremminger).

[20] A proffer in this context means a statement by a subject of the investigation.  Under the terms of the standard proffer agreement used in this district, the government may not use the statement in its case-in-chief, but it is free to use leads obtained from it and may use the statement on cross-examination and in a variety of other circumstances.  FEDERAL BAR COUNCIL, PROFFER, PLEA AND COOPERATION AGREEMENTS IN THE SECOND CIRCUIT 3-13 (2003).  *See also* Richard B. Zabel and James J. Benjamin, Jr., *"Queen for a Day" or "Courtesan for a Day": The Sixth Amendment Limits to Proffer Agreements,* 15 No. 9 WHITE-COLLAR CRIME REP. 1 (2001).

 Mr. Bickham proffered on August 11, 2004.  Niespolo Reply Decl. [docket item 588] ¶ 7.  Mr. DeLap did so on May 26-27 and June 30, 2004 and January 11 and September 30, 2005.  Parker Decl. [docket item 587] ¶ 2, attached Barcella Decl. ¶ 5.  Mr. Rosenthal proffered on September 14 and 29, 2004.  Necheles Decl. [docket item 589], attached Auerbach Decl. ¶ 4.  Mr. Watson did so on April 1 and 13 and September 9, 2004.  Watson Decl. [docket item 545, Ex. A] ¶ 8.  The record does not disclose the dates of proffers by Messrs. Hasting and Wiesner.

proffer agreement[21] after receiving the letter or, in one case, after having been told its substance but before receiving it.[22] Six of the nine[23] left KPMG before they made their statements and do not claim that they made their statements under a threat of loss of their employment. There is no evidence that Mr. Gremminger, one of the three who made a proffer while still employed by KPMG, ever was threatened with firing if he did not make a statement. The situations of the other two, Mr. Smith and Ms. Warley, were different.

Mr. Smith initially refused to make a proffer. Ms. Warley, on the other hand, made a proffer on April 21, 2004.[24] This led to a dispute between her Texas counsel and the USAO in which the attorney demanded agreement by the government with a number of conditions as a prerequisite to a further session.[25]

On May 18, 2004, AUSA Weddle informed Skadden that (1) Mr. Smith had refused to meet with the government and (2) although Ms. Warley had met with prosecutors once, she had refused to meet again except on conditions unacceptable to the USAO.[26] Within days, Eugene O'Kelly, then chairman of KPMG, told Mr. Smith that he understood that "there were concerns about whether [Mr. Smith] was cooperating with the investigation" and told Mr. Smith that "he did not want

---

[21] *See, e.g.,* DX Smith D (Smith's proffer agreement); DX CW-3 (Warley's proffer agreement); DX MW-4 (Watson's proffer agreement).

[22] Mr. Rosenthal's counsel did not receive a letter until February 4, 2005, several months *after* his last proffer to the government. K175-76. KPMG, however, apparently had informed his counsel of its decision to condition payment of fees upon cooperation with the government before his initial proffer session. Necheles Decl. [docket item 589], attached Auerbach Aff. ¶¶ 4, 7.

[23] Messrs. Bickham, DeLap, Hasting, Rosenthal, Watson and Wiesner.

[24] De Vita Aff. [docket item 580] ¶ 4.

[25] K19-29, K34.

[26] K30.

[him] to put [Mr. O'Kelly] in a position where he was forced to take action against" him.[27] Mr. Smith quite reasonably interpreted this comment as meaning that KPMG would fire him if he did not proffer to the government.[28]

On May 28, 2004, promptly after the O'Kelly-Smith conversation, Skadden forwarded copies of Mr. Weddle's letter to counsel for Smith and Warley. The cover letters stated in relevant part:

> "Absent an indication within the next ten business days from the government that your client no longer refuses to meet with the government pursuant to its standard proffer agreement, KPMG will cease payment of [the client's legal] fees.
>
> "Finally, please note that KPMG will view continued non-cooperation as a basis for disciplinary action, including expulsion from the Firm."[29]

Shortly after this threat, Mr. Smith – acting against the advice of his attorney and in order to keep his job – changed his position.[30] He entered into the USAO's standard proffer agreement on June 16, 2004 and met with prosecutors on that date, June 17, and November 23, 2004.[31]

The record does not fully disclose what transpired next between Ms. Warley and the USAO.[32] In any event, she returned for a second proffer session on October 19, 2004 that lasted less

---

[27] Tr. II (Smith) 11:19-12:19, *see also* 16:8-17:24.

[28] *Id.* 12:20-23.

[29] K44; K45.

[30] Tr. II (Smith) 17:5-18:25.

[31] Rule Decl. [docket item 529] ¶ 3 & Ex. A.

[32] K30.

Mr. Weddle sent another letter complaining about alleged lack of cooperation by Ms. Warley on June 15, 2004. K49.

than twenty minutes.[33] Ms. Warley's counsel advised the government that Ms. Warley believed that certain Texas statutes precluded her from voluntarily revealing client information without the clients' permission and asked for a grand jury subpoena, compliance with which would be mandatory. The government obliged, but the USAO then terminated the proffer session despite Ms. Warley's request to continue.[34] A few days later, Ms. Warley appeared before the grand jury but invoked the Fifth Amendment.[35]

On November 10, 2004, Mr. Weddle again wrote to Skadden, informing it that "notwithstanding [Ms. Warley's] counsel's representations that she would cooperate with the investigation, [she] continues to refuse to cooperate."[36] On November 15, 2004, Skadden forwarded the government's letter to Ms. Warley's counsel and advised him that KPMG had ceased payment of her legal fees, effective November 10, 2004. It added:

> "In addition, absent an indication from the government within the next ten business days that your client no longer refuses to cooperate with the investigation, KPMG will consider additional actions, including Ms. Warley's separation from the Firm."[37]

---

[33]    Govt. Mem. [docket item 569] 6; DeVita Aff. [docket item 580] ¶ 6.

[34]    Tr. II (Townsend) 94:12 - 95:16; *id.* (Warley) 120:4 - 121:17; De Vita Aff. ¶ 6.

[35]    De Vita Aff. ¶ 7.

[36]    K81.

[37]    K93.

In the end, Ms. Warley's counsel disputed the claim that she had not cooperated,[38] but she nevertheless was terminated by KPMG.[39] Subsequent negotiations between Ms. Warley's counsel and the government concerning a further proffer were not successful.[40]

In sum, then, all of the proffers followed KPMG's conditioning of the payment of attorneys' fees on employees' cooperation with the government. In addition, Mr. Smith's proffer and that of Ms. Warley on October 19, 2004 both followed explicit threats of employment termination.

*KMPG's Claims that It Successfully Pressured Employees to Talk*

KPMG repeatedly claimed that there was a direct causal connection between its actions and the proffers by some of its employees.

In a November 2, 2004 letter to the USAO, which obviously was intended to demonstrate that KPMG should not be indicted because, among other things, it had cooperated with the government, Skadden wrote:

> "KPMG has repeatedly directed all current and former personnel to cooperate with the investigation and has conditioned payment of attorney's fees upon prompt, complete, and truthful cooperation with the government's inquiry. Whenever your Office has notified us that individuals have not rendered prompt, complete, and truthful cooperation, KPMG has promptly and without question encouraged them to cooperate and threatened to cease payment of their attorney fees and (if applicable) to take personnel action, including termination. *In certain instances, KPMG's action has led previously non-cooperating individuals to meet with your Office.* In other instances, KPMG has ceased payment of fees and expenses."[41]

---

[38] K96.

[39] Warley Aff. in Support of Motion for Severance [docket item 255] ¶ 5.

[40] Tr. II (Warley) 122:7 - 124:8.

[41] K68 (emphasis added).

At later meetings, and in a so-called "White Paper" that argued against indictment of the firm, Mr. Bennett "noted that KPMG had 'hinged attorneys fees on whether people would talk to [the government]'" and "that KPMG had cut off fees for several individuals for non-cooperation and had terminated two partners for non-cooperation," including for *"asserting . . . [the] 5th Amendment right not to testify."*[42]   A memorandum of a June 13, 2005 meeting with the DOJ discloses that Mr. Bennett argued that "We [KPMG] said we'd pressure – although we didn't use that word – our employees to cooperate" and when employees did not cooperate, "Justin [AUSA Weddle] or Stan [AUSA Okula] would tell us," and the firm then cut off fee payments and/or fired the individual.[43]   Indeed, KPMG's final submission to the DOJ argued that it had fully cooperated by, among other things, "pressuring current and former personnel to cooperate fully with the investigation."[44]

### Analysis

I.    *As the Failure to Make this Motion Earlier Was a Product of Excusable Neglect, the Court On Its Own Motion Extends the Time Within Which to Make It to the Date of its Filing*

Rules 12(e) and 12(b)(3) provide that any motion to suppress "not raised by the deadline the court sets under Rule 12(c) or any extension the court provides" is waived.[45]   The motion deadline in this case was January 12, 2006.[46]

---

[42]    K342, 336, 132-33 (emphasis added).

[43]    K350.

[44]    K385.

[45]    FED. R. CRIM. P. 12(e).

[46]    *See* docket item 187.

This motion was not made until May 2006. The government argues that the belated filing of the motion waived any objection to the uses of the proffer statements and their fruits that would be consistent with the proffer agreements under which they were made. Defendants dispute the characterization of the motion as one to suppress and, in any case, argue that the Court should relieve them of any waiver pursuant to Rule 12(e), particularly in light of their contention that facts relevant to their contentions first became available in connection with the hearing held on May 8-10, 2006.

It is doubtful that defendants should be relieved of any waiver because facts important to the motion first became available in or about May 2006. The Moving Defendants were aware prior to the motion deadline of the Thompson Memorandum and of KPMG's coercive actions.[47] They could have moved to suppress on that basis alone, just as they moved for relief with respect to KPMG's actions with respect to advancement of legal fees, without the additional evidence of the government's involvement in KPMG's actions that came to light in connection with the May 8-10 hearing. It is unnecessary, however, to make that determination.

Under Rule 45(b), the Court is empowered to extend the deadline on its own motion or, for good cause shown, on a party's motion made after the time expires if the party failed to act because of excusable neglect.[48] As the Supreme Court has said, the question whether neglect is excusable is "at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission."[49] Indeed, "[e]xcusable neglect is a flexible concept . . . [I]ts parameters are

---

[47] *See, e.g., United States v. Yousef,* 327 F.3d 56, 125 (2d Cir. 2003).

[48] FED. R. CRIM. P. 45(b)(1).

[49] *Pioneer Inv. Services Co. v. Brunswick Assoc. L.P.*, 507 U.S. 380, 394-95 (1993); *see also, e.g., Williams v. KFC Nat'l Mgmt. Co.,* 391 F.3d 411, 415 (2d Cir. 2004); *Silivanch v.*

informed by, and roughly congruent with, the interests of justice."[50]  The relevant circumstances include the reason for the delay, including whether it was within the reasonable control of the Moving Defendants, the danger of prejudice to the government, and the length of the delay and its potential impact on these judicial proceedings.[51]

There is no denying that the delay in bringing the motion is attributable to the Moving Defendants.  Their fault in that regard, however, is mitigated substantially by the unique circumstances of this case.  As pointed out in *Stein I,* this is a complex case in which defendants are dealing with a 46-count indictment, millions of documents produced in discovery, and a plethora of legal issues.  They in fact filed 26 motions at the deadline accompanied by memoranda of law surpassing, in the aggregate, 1,000 pages.  They were constrained, in some degree, by a shortage of resources attributable to the government's unconstitutional interference with KPMG's payment of legal fees and other defense costs.  While they probably should have realized that the logic of their motion addressed to advancement of legal fees at least implied that this motion too ought to have been made, due allowance should be made in such a situation for human fallibility, especially where substantial rights otherwise might be prejudiced.  Certainly the Court thus far has been tolerant of the government's failure to comply in some respects with the discovery deadline.[52]

---

*Celebrity Cruises, Inc.*, 333 F.3d 355, 366 (2d Cir. 2003); *Canfield v. Van Atta Buick/GMC Truck Inc.,* 127 F.3d 248, 249-50 (2d Cir. 1997) (per curiam), *cert. denied,* 522 U.S. 1117 (1998) (quoting *Weinstock v. Cleary, Gottlieb, Steen & Hamilton,* 16 F.3d 501, 503 (2d Cir.1994).

[50]     *United States v. Roberts*, 978 F.2d 17, 21 (1st Cir. 1992); *see also Pioneer,* 507 U.S. at 392; *Silivanch,* 33 F.3d at 366; *Canfield,* 127 F.3d at 250.

[51]     *Pioneer,* 507 U.S. at 395; *Silivanch,* 33 F.3d at 366; *Williams,* 391 F.3d at 415; *Roberts,* 978 F.2d at 21.

[52]     Tr., July 13, 2006, at 94:22-95:1.

The second pertinent factor is whether excusing defendants' omission would prejudice the government. The government, however, has conceded that permitting defendants to make this motion now will not prejudice it in any respect.[53]

Nor does the length of the delay weigh substantially against the defendants. At least some of the Moving Defendants sought to go into the issues raised by this motion in March 2006, during oral argument of[54] and again at the May 2006 hearing on the prior motions. On the latter occasion, the Court sustained an objection because the issue had not been raised by the motion. But the government certainly was aware from March 30 on that it likely would have to confront the issue.

Finally, the Court is persuaded that the belated determination of this issue would not so affect the future course of these proceedings as to warrant declining to consider the matter on the merits. It already has been obliged to postpone the trial for four months, principally as a result of the government's interference with the advancement of legal fees and its failure to complete document discovery on time.

Accordingly, the Court, on its own motion, holds that the failure of the Moving Defendants to make this motion by January 12, 2006 was a product of excusable neglect and extends the deadline for making it to and including the date on which it actually was made, May 26, 2006.

---

[53]     *Id.* at 47:11-13.

[54]     Tr., Mar. 30, 2006, 36:7-16.

*II.     The Voluntariness of the Statements*

The Fifth Amendment provides in relevant part that "No person . . . shall be compelled in any criminal case to be a witness against himself."[55]  An individual claiming a violation of the privilege against self-incrimination must prove that the statement sought to be suppressed was a product of compulsion by or attributable to the government.[56]

The Moving Defendants claim that their statements to the USAO were coerced by KPMG's conditioning the payment of their legal fees and, in some cases, their continued employment upon their cooperation with the government. Acknowledging that the Fifth Amendment restricts only governmental action, they contend that KPMG's coercion violated their rights under the Fifth Amendment because KPMG's actions were attributable to the government.  But it is unnecessary to reach that latter question except to the extent that the Moving Defendants have demonstrated that their statements to the USAO were coerced by KPMG.  This requires careful attention to the evidence.

A.     *Messrs. Bickham, DeLap, Gremminger, Hasting, Rosenthal, and Wiesner and, With Respect to Her First Proffer, Ms. Warley, Did Not Offer Evidence that, If Credited, Would Be Sufficient to Warrant a Finding that Those Statements Were Coerced. Their Motions With Respect to These Statements Are Denied.*

Messrs. Bickham, DeLap, Gremminger, Hasting, Rosenthal, and Wiesner, and, with respect to her first proffer, Ms. Warley, are situated similarly in this respect.  All were told that KPMG would pay their legal fees, up to $400,000, provided they cooperated fully with the government and provided further that all payments would be cut off if they were indicted.  All later

---

[55]     U.S. Const. amend. V.

[56]     *See, e.g., Nat'l Coll. Ath. Ass'n v. Tarkanian,* 488 U.S. 179, 191 (1988).

made statements to the USAO. So they invite the Court to conclude that KPMG's conditioning payment of their legal fees upon their cooperation rendered their statements coerced or involuntary.

It no longer may be doubted that economic coercion to secure a waiver of the privilege against self-incrimination, where it is attributable to the government, violates the Fifth Amendment if the pressure is sufficient to "deprive[] [the accused] of his 'free choice to admit, to deny, or to refuse to answer.'"[57] The point is well illustrated by *Garrity v. New Jersey,*[58] where the Supreme Court held that statements obtained from police officers in circumstances in which a state statute would have required the termination of their employment had they declined to answer were involuntary and therefore inadmissible against them in a criminal trial. So one may not exclude the possibility that KPMG's conditioning of the payment of legal fees upon cooperating with the prosecutors, assuming it was attributable to the government, left these defendants with no choice but to talk. Yet that is only the beginning of the discussion.

None of these defendants submitted an affidavit or comparable evidence stating facts that, if proved, would demonstrate that KPMG's actions left him or, in the case or her first proffer, Ms. Warley, with no alternative but to speak to the prosecutors. Indeed, they failed to submit such evidence even after the government's answering papers pointed to the lack of proof of economic coercion.[59]

---

[57]     *Garrity v. New Jersey,* 385 U.S. 493, 496 (1967) (quoting *Lisenba v. California,* 314 U.S. 219, 241 (1941)).

[58]     *Id.*

[59]     Govt. Mem. [docket item 569] 24-27.

    At the argument of the motion, when the likely significance of this failure became apparent, certain of these defendants sought leave to file such affidavits. The Court denied the application. Tr., July 13, 2006, at 61:6-62:13. The Court already has relieved the Moving Defendants of the waiver that flowed from their failure to make the motion in January, when

In ordinary circumstances, this would be fatal. "A party seeking to raise a factual issue to be determined at a hearing must submit admissible evidence which, if credited, would make out a *prima facie* case on the issue. This in turn requires that the issue ordinarily be raised by an affidavit of a person with personal knowledge of the facts."[60] In the absence of such evidence, a motion to suppress will be denied without a hearing.

These defendants nevertheless argue that they are entitled to suppression because the test of coercion is purely objective and has been satisfied here. They point to KPMG's conditioning of the payment of legal fees on cooperation, and some have submitted affidavits or declarations by their lawyers, the burden of which is that the clients were incurring substantial legal expenses and needed the money that KPMG threatened to withhold.[61] They rely principally on *Garrity* and the

---

it was due. They were on ample notice of the need for affidavits. This failure is not excusable.

[60] *United States v. Ahmad,* 992 F. Supp. 682, 685 (S.D.N.Y. 1998) (citing *United States v. Gillette,* 3838 F.2d 843, 848 (2d Cir. 1967)); *see also United States v. Ciriaco,* 121 Fed.Appx. 907, 908-09 (2d Cir. 2005) (affirming the denial of evidentiary hearing on a motion to suppress where defendant failed to submit "moving papers that are sufficiently definite, specific, detailed, and non-conjectural as to indicate relevant contested issues of fact"); *United States v. $557,933.89, More or Less, in U.S. Funds,* 287 F.3d 66, 83-84 (2d Cir. 2002) (affirming the denial of evidentiary hearing on a motion to suppress where defendant "failed to produce [evidence regarding the allegedly illegal search and seizure] despite the fact that he was a witness to the search and could have competently testified to either fact"); *United States v. Barrios,* No. 97-1363, 2000 WL 419940, *1 (2d Cir. Apr. 18, 2000) (defendant moving for the suppression of evidence "is not automatically entitled to a suppression hearing unless he supports his motion with moving papers [that] are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question, including an affidavit of someone alleging personal knowledge of the relevant facts.") (internal citations and quotation marks omitted); *United States v. Nelson,* 335 F. Supp.2d 477, 479 (S.D.N.Y. 2004) (defendant "not entitled to an evidentiary hearing unless he offers an affidavit from an individual with personal knowledge of the relevant facts demonstrating that disputed issues of material fact exist").

[61] DePetris Reply Decl. [docket item 581] ¶ 3; Olsen Reply Decl. [docket item 582]; Rule Reply Decl. [docket item 585] ¶ 4; Parker Decl. [docket item 587], attached Barcella Decl. ¶ 6-10; Niespolo Reply Decl. [docket item 588] ¶ 6; Necheles Decl. [docket item 589], attached Auerbach Decl. ¶¶ 6-9.

Second Circuit's decision in *United States ex rel. Sanney v. Montanye.*[62] The argument, however, is unpersuasive, at least in this case.

As noted, *Garrity* held that statements obtained from police officers in circumstances in which invocation of the Fifth Amendment would have required termination of their employment were coerced. It is true, as the Moving Defendants argue, that the trial court held a voluntariness hearing in the apparent absence of any affidavits from the officers[63] and that the Supreme Court held the statements to have been involuntary despite the fact that the officers did not testify at the hearing.[64] But this does not solve the problem for the Moving Defendants for two reasons.

To begin with, *Garrity* and its progeny are not properly read as holding that the test of voluntariness is purely objective. While the majority opinion is none too clear, it did distinguish the situation before it from a case in which "one who is anxious to make a clean breast of the whole affair volunteers the information,"[65] thus acknowledging the continuing role of subjective considerations. Indeed, Judge Friendly long ago noted that "it is not clear whether *Garrity* rests on violation of the privilege or on the basis that the statements 'were involuntary as a matter of fact', or

---

[62] 500 F.2d 411 (2d Cir.), *cert. denied,* 419 U.S. 1027 (1974).

[63] *See State v. Naglee*, 44 N.J. 209, 219, 207 A.2d 689, 694 (1965), *rev'd sub nom., Garrity v. New Jersey,* 385 U.S. 493. The record indicates that the trial court elected to hold such a hearing on its own motion without objection. Transcript of Record at 11-12, 28-30, *Garrity,* 385 U.S. 493.

[64] 385 U.S. at 495 n.2.

[65] *Id.* at 498-99.

both."[66] Subsequent cases have made clear that an employee claiming that a statement was coerced by a threat of employment termination must demonstrate that the belief that termination would follow a refusal to speak was both objectively reasonable and subjectively held.[67]

These considerations strongly suggest, and this Court holds, that an individual claiming that a statement was compelled in violation of the Fifth Amendment must adduce evidence *both* that the individual subjectively believed that he or she had no real choice but to speak *and* that a reasonable person in that position would have felt the same way.[68] The Fifth Amendment is a bulwark against government coercion. There would be little reason to exclude a statement as obtained in violation of the Fifth Amendment if the speaker did not in fact feel compelled to make the statement. Nor would it make much sense to do so if a thin-skinned or an irrational person perceived compulsion in circumstances in which reasonable people would not.

*Garrity* is consistent with this view. The police officers there were called as witnesses in a state investigation of the alleged fixing of traffic tickets. They were told that they had the right to remain silent and warned that any testimony they gave might be used against them in a criminal prosecution. But a state statute made clear also that they would lose their jobs if they declined to

---

[66]     *United States v. Solomon,* 509 F.2d 863, 867 (2d Cir. 1975) (quoting *Garrity,* 385 U.S. at 501 (Harlan, J., dissenting)).

[67]     *See, e.g., United States v. Waldon,* 363 F.3d 1103, 1112 (11th Cir. 2004); *United States v. Vangates,* 287 F.3d 1315, 1321-22 (11th Cir. 2002); *United States v. Friedrick,* 842 F.2d 382, 395 (D.C. Cir. 1988); *see also McKinley v. City of Mansfield,* 404 F.3d 418, 436 & n.20 (6th Cir. 2005); *State v. Lacaillade,* 266 N.J. Super. 522, 528, 630 A.2d 328, 332 (App. Div. 1993).

[68]     Once the voluntariness of a statement is properly placed in issue, the burden of proving that it was voluntary is on the government. *See Lego v. Twomey,* 404 U.S. 477, 489 (1972); *Brown v. Warden, Great Meadow Corr. Fac.,* 682 F.2d 348, 351 (2d Cir. 1982).

answer questions.[69] Thus, while it was possible that they spoke voluntarily rather than because their jobs were on the line, that was unlikely. It was far more probable that they spoke to save their jobs. *Garrity* therefore is best understood as holding that the existence of the statute mandating termination if the officers invoked the Fifth Amendment was sufficient, in the absence of any contrary evidence, to require a conclusion that the statements were coerced.

This is a different situation. Prospective criminal defendants often make so-called queen for a day proffers to prosecutors, and they do so for several reasons. As the Moving Defendants concede, some do so in the hope of obtaining a cooperation agreement. Some do so in efforts to negotiate pleas. And some do so in the hope of persuading the government not to indict at all.[70] Thus, the fact that most of these defendants made proffers after KPMG conditioned the continued payment of their legal fees on their cooperating with the government in and of itself sheds little light on whether their statements were coerced. In other words, the fact that these defendants proffered *after* KPMG conditioned payment of their legal fees on cooperation does not mean that they proffered, even in part, *because* KPMG so conditioned payment.[71] To illustrate the point, Mr. Watson acknowledges that he proffered on the first of several occasions voluntarily because he hoped to persuade the USAO that he should not have been prosecuted.[72]

---

[69]   *Garrity,* 385 U.S. at 494.

[70]   Tr., July 13, 2006, at 23:10-24:4.

   *See, e.g.,* Benjamin A. Naftalis, *"Queen For A Day" Agreements and the Proper Scope of Permissible Waiver of the Federal Plea-Statement Rules,* 37 COLUM. J. L. & SOC. PROBS. 1, 5 (2003).

[71]   Defendant Eischeid and, apparently, other KPMG employees who were in similar positions elected not to make proffers.

[72]   Tr. II. (Watson), at 136:23-137:8.

In consequence, *Garrity* does not require the result the Moving Defendants advocate. While it stands for the proposition that the coerced nature of a statement sometimes may be apparent on undisputed facts, it does not support the Moving Defendants' argument that the existence of an objectively coercive influence alone is sufficient to warrant suppression, even where other evidence or common sense suggests that the statement at issue in fact was voluntary.

*Montanye* stands these defendants in no better stead. The defendant in that case challenged the use of statements he had made to a private employer in response to questions the employer asked at the behest of law enforcement personnel. The Court of Appeals held that the threatened economic consequence of a refusal to answer – the possible loss of a position by "a transient manual laborer who had been on the job for at most a couple of days"[73] – was not sufficiently substantial to amount to unconstitutional coercion and, in any case, that the statements "were in fact voluntary."[74]

In the last analysis, then, the question is whether these defendants submitted "admissible evidence which, if credited, would make out a *prima facie* case" that their statements in fact were coerced.[75] They offered nothing save the sequence of events – KPMG's conditioning of further payments on cooperation followed by their decisions to proffer, in some cases the fact that they were incurring substantial legal fees, and the self-serving assertions of KPMG's lawyers to the government. The latter may not even have related to these defendants as opposed to other KPMG employees who ultimately were not indicted. In light of the fact that proffers often are made voluntarily to serve the interests of those of make them, that is not enough absent some reliable proof

---

[73]   500 F.2d at 415.

[74]   *Id.* at 415-16.

[75]   *Ahmad,* 992 F. Supp. at 685.

that the proffers in question were coerced rather than voluntary acts. There is no factual issue warranting an evidentiary hearing, and the motion is denied in respect of these statements.

> B.     *The Proffer Statements Made by Messrs. Smith and Watson Were Coerced. Those Made By Ms. Warley In Her Second Proffer Were Not.*

The situations of Mr. Smith and, with respect to all but the first of their proffers, Mr. Watson and Ms. Warley are quite different. Mr. Watson submitted a declaration asserting that he decided to proffer on the second and third occasions only because of the pressure placed upon him by KPMG.[76] Although Mr. Smith and Ms. Warley did not submit affidavits addressing the issue of voluntariness, there was more than sufficient evidence to raise an issue of fact on that point.[77] In consequence, the Court held an evidentiary hearing on the issue of coercion of these statements.

> 1.     *Mr. Smith*

The evidence that Mr. Smith's proffers all were coerced is compelling. After he received the March 11, 2004 letter, the government requested that he proffer. Despite KPMG's

---

[76]     Watson Decl. [docket item 545, Ex. A] ¶ 9.

[77]     The pre-hearing record showed that Mr. Smith, even after KPMG threatened to cut off legal fees for non-cooperation, persisted in his refusal to speak to the government. On May 18, 2004, the USAO brought this to KPMG's attention. Days later, Skadden, on behalf of KPMG, not only reiterated the threat to cut off payment of legal fees, but explicitly threatened Mr. Smith with expulsion from the firm.

Similarly, there was pre-hearing evidence showing that Ms. Warley's counsel refused to permit her to appear for a second interview absent government agreement to conditions that it found unacceptable. Only after the government brought her alleged failure to cooperate to KPMG's attention, after KPMG failed to alter its own position in response to her attorney's plea, and after KPMG threatened to fire her did she appear for the second session. In each of these cases, then, there was evidence giving rise to an inference that the defendant proffered as a direct result of a threat of firing.

insistence on cooperation and its having conditioned the payment of legal fees upon compliance with that request, he refused. In May, however, the government reported his refusal to KPMG. Mr. O'Kelly implicitly but unmistakably threatened to fire him if he did not fall into line. The threat was made explicit by Skadden on May 28, 2004. Mr. Smith, whose family was entirely dependent upon him for support, rejected his attorney's advice and agreed to proffer in order to save his job.

The government argues that Mr. Smith's decision was not a product of the government's pressure on KPMG, arguing that he previously had made statements to government bodies or otherwise represented the firm vis-a-vis government agencies and concerned clients because he, as a very senior company official, and KPMG had a "unity of interest."[78] But this contention is not persuasive.

To be sure, Mr. Smith, as vice chair of the firm, took a prominent position in attempting to deal with a host of matters related to the tax shelters at issue in this case. He was involved, to varying degrees, with the IRS promoter audit, the SEC independence investigation, the DOJ summons enforcement proceeding, and other matters and testified before the Senate. The government may well be correct that his position would have been in jeopardy if he had refused to engage in these activities. But that does not get the government where it wants to go.

To begin with, the question here is whether the statements Mr. Smith made to the USAO after KPMG conditioned payment of his legal fees on his cooperation and explicitly threatened to fire him if he did not waive his constitutional rights and proffer were coerced. That other statements also might have been coerced by fear of loss of his job is beside the point.

---

[78]     Tr. II at 205:6-208:5; *see also* 24:17-27:4.

Second, there is a world of difference between the prior statements and activities and those in question here. The former occurred in circumstances in which only KPMG's interests were immediately at stake, not Mr. Smith's personal liberty. Once the criminal referral was made and the USAO sent Mr. Smith a subject letter, the personal stakes for him changed dramatically. In consequence, even assuming *arguendo* that Mr. Smith voluntarily took some risks for the firm before he became the subject of a criminal investigation, the suggestion that he voluntarily ran the risk to his own freedom that was entailed in submitting to questions from prosecutors would lack force.

Finally, the question ultimately is one of credibility. The Court credits Mr. Smith's testimony and finds that he made the statements at the proffer sessions because KPMG threatened to fire him and cut off payment of his legal fees if he did not. The statements were coerced.[79]

---

[79] The government offered in evidence its memoranda of the proffer sessions involving Messrs. Smith and Watson and Ms. Warley (GX MW-1 through MW-3, CW-1, CW-2, RS-1, and RS-2) for the purposes of illustrating the statements they seek to suppress and in an attempt to demonstrate from their substance that the statements were made voluntarily. These defendants objected, arguing that the government's memoranda were hearsay and inaccurate. The Court received them for the limited purpose of identifying some of the statements that these defendants seek to suppress and indicated that it otherwise would consider them "for what they're worth." Tr. II 154:22-169:3. The Court now declines for at least two reasons to give substantial weight to the memoranda to the extent they are offered for the truth of the matters asserted.

First, the essence of the government's argument is that these defendants' proffers sought to portray the defendants in favorable lights, which the government maintains suggests that the defendants proffered voluntarily in efforts to avoid indictment or strike favorable agreements with the government. The memoranda, however, even assuming their accuracy, are not strongly probative on the issue of voluntariness. Once an investigative subject finds him- or herself speaking to prosecutors, willingly or otherwise, it is only natural to present a picture of innocence or to seek a favorable outcome by some other means. But the critical question here is whether these defendants were coerced into speaking to the prosecutors in the first place. What they may have said once they got there does not necessarily shed much light on why they appeared.

Second, while hearsay is admissible in suppression hearings, courts are not obliged to blind themselves to the reasons underlying the hearsay rule in determining the weight it should be given. Here, the government elected not to present witnesses as to what the defendants said in their proffer sessions and thus avoided cross-examination concerning the accuracy of the

2.      *Mr. Watson*

Mr. Watson is a young man who joined KPMG in 1992 as a staff accountant, became a non-equity partner in 1997, an equity partner in October 2001, and left the firm in July 2002.[80] He subsequently pursued two business ventures that failed and has been unemployed for nearly a year.[81]

In the spring of 2004, his net worth was about $320,000, of which about a third was the equity in his personal residence.[82] He received a subject letter from the USAO shortly after March 15, 2004 followed quickly by the KPMG form letter that said it would pay his legal expenses in connection with the investigation, up to $400,000, provided he cooperated with the government.

Mr. Watson had been a witness before the Senate subcommittee in November 2003. He understood that the Senate staff viewed him as a whistleblower[83] and that he had nothing to fear. He soon learned, however, that the USAO viewed him differently.[84] Nevertheless, after receiving the subject letter, he asked his attorneys to reach out to the government and to offer to speak to them,

---

memoranda. The untested nature of the memoranda warrants caution.

Accordingly, the Court finds the memoranda unpersuasive as to the reasons these defendants made their proffers.

[80]      Tr. II (Watson) 130:25-132:2.

[81]      *Id.* 132:8-134:5.

[82]      *Id.* 134:6-13.

[83]      *Id.* 141:17-142:15.

[84]      *See id.* 145:9-19.

which he did for the first time on April 1, 2004.[85]  He did so voluntarily because he "felt that the government misunderstood [his] involvement . . . and that if [he] went in, [he] could clear up that misunderstanding and convince them not to indict [him]."[86]

Mr. Watson was greatly disappointed by his reception at the USAO.  He left the meeting thinking that it had gone "very poorly" and "felt sick about it."[87]  After consulting with counsel, he concluded that he "did not want to return for . . . further proffer sessions."[88]  Nevertheless, he returned for two subsequent proffer sessions.  He testified that he did so because he could not afford to pay for what he regarded as an adequate defense and felt compelled to return in order to avoid KPMG cutting off payment of his legal fees.[89]

The government has sought to suggest that Mr. Watson returned for the second and third proffer sessions in order to explore the possibility of a cooperation agreement or some other negotiated arrangement that would limit his criminal exposure.  But the argument ultimately is not persuasive on the critical point in issue, which is whether he returned voluntarily.

Having considered the evidence and observed Mr. Watson on the stand, the Court credits his testimony that he returned for the second and third proffer sessions only because he felt compelled to do so by KPMG's having conditioned payment of his legal fees on his cooperating with the prosecutors.  Once he returned for those sessions, he no doubt sought to achieve the best possible outcome.  But that does not undercut the conclusion that KPMG coerced his appearance by

---

[85]  *Id.* 136:23-137:8.

[86]  *Id.* 137:4-8.

[87]  *Id.* 137:17-22.

[88]  *Id.* 138:22-139:1.

[89]  *Id.* 139:6-141:6.

conditioning payment of his legal fees on his appearance and cooperation. Moreover, given Mr. Watson's financial situation, the Court finds that KPMG's condition left him with no practical choice but to cooperate.

The Court recognizes that the criminal process often requires defendants and prospective defendants to make hard choices among unpalatable alternatives and that there often is nothing wrong with this.[90] What distinguishes this case is that the government here coerced KPMG to apply pressure to Mr. Watson and other individual defendants in order to secure waivers of constitutional rights that the government itself could not obtain. That goes beyond the bounds of appropriate government action.

### 3. *Ms. Warley*

Ms. Warley received a subject letter and the KPMG form letter as did the others. She proffered almost immediately. She testified that her decision to do so was influenced by KPMG conditioning payment of her legal fees on cooperation and by concern that she otherwise would have lost her job.[91] But the overall picture is more complex.

To begin with, Ms. Warley acknowledged at another point in her testimony that she went in to speak to the prosecutors "to let them know that [she] was innocent" and "because [she] wanted to cooperate."[92] She also portrayed herself as inexpert in tax matters, identified others at KPMG who had not received subject letters and whom she regarded as situated similarly to herself,

---

[90]     *See, e.g., United States v. Baum,* 380 F. Supp.2d 187, 210 (S.D.N.Y.), *aff'd sub nom. United States v. Best,* 139 Fed.Appx. 366 (2d Cir. 2005).

[91]     Tr. II (Warley) 112:2-9.

[92]     *Id.* 114:15-20.

and pointed a finger at KPMG's Washington National Tax unit.[93]  Thus, even recognizing that the substance of statements made at a proffer session do not necessarily speak to the reason the witness appeared in the first place, there is more reason in Ms. Warley's case to think that her decision to appear for the April 21 session was voluntary.

Subsequent events tend to bear this out.  Ms. Warley did not return for a second session for a protracted period in some measure because her Texas counsel quite obviously had a personality conflict with one of the prosecutors[94] and also sought to impose conditions on a further appearance that the government would not accept.  In late May 2004, KPMG, having been advised of Ms. Warley's alleged lack of cooperation, told her that payment of her fees would be cut off and she could be fired if she did not satisfy the government.  But she did not appear again until October 19, 2004, at which point she refused to answer questions in certain areas except before a grand jury pursuant to subpoena.[95]  She then was subpoenaed before the grand jury and, despite her previous statements, invoked the Fifth Amendment knowing that payment of her legal fees would be cut off and that she probably would be fired.[96]  Nevertheless, a short time later, she testified concerning matters at issue here in a deposition in a civil action.[97]

In all the circumstances, it appears that Ms. Warley at all times acted in what she regarded as her best interests without regard to whether KPMG would cut off payment of her fees or terminate her employment.  While the question is a close one, the Court is persuaded by a

---

[93]  *Id.* 115:19-117:4.

[94]  *See, e.g.* K96.

[95]  Tr. II (Townsend) 94:12-95:16; *id.* (Warley) 120:4 - 121:17.

[96]  Tr. II (Warley) 120:4-124:15.

[97]  *Id.* 124:16-127:22.

preponderance of the evidence that the statements she made in her proffer sessions were voluntary in fact.

III.     *The Actions of KPMG in Coercing these Statements Are Attributable to the Government.*

This is not the end of the analysis. The Fifth Amendment "restricts only governmental conduct, and will constrain a private entity only insofar as its actions are found to be 'fairly attributable' to the government."[98] Accordingly, defendants Smith and Watson are entitled to suppression only if the actions of KPMG in coercing the statements in question are fairly attributable to the government.

As the Supreme Court has explained, action by a private entity is "fairly attributable" to the government where "there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself."[99] Such a nexus exists either "(1) where the state 'has exercised coercive power [over a private decision] or has provided such significant encouragement, either overt or covert, that the choice [by the private actor] must in law be deemed to be that of the State;' or (2) where 'the private entity has exercised powers that are traditionally the exclusive prerogative of the State.'"[100] In other words, state action will be found where the government commands or significantly encourages a

---

[98]     *D.L. Cromwell Invests., Inc. v. NASD Regulation, Inc.,* 279 F.3d 155,161 (2d Cir. 2002); *accord, Lugar v. Edmondson Oil Co.,Inc.,* 457 U.S. 922, 937 (1982); *Corrigan v. Buckley,* 271 U.S. 323, 330 (1926).

[99]     *Blum v. Yaretsky,* 457 U.S. 991, 1004-05 (1982) (citing *Jackson v. Metro. Edison Co.,* 419 U.S. 345, 350 (1974)); *see also Cromwell,* 279 F.3d at 161; *Desiderio v. Nat'l Ass'n of Sec. Dealers, Inc.,* 191 F.3d 198, 206-07 (2d Cir. 1999), *cert. denied,* 531 U.S. 1069 (2001).

[100]     *Cromwell,* 279 F.3d at 161 (quoting *Blum,* 457 U.S. at 1004-05); *accord, Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n,* 531 U.S. 288, 296 (2001).

private entity to take the specific action alleged to violate the Fifth Amendment, as well as where the government is "entwined" in the management or control of specific conduct at issue.[101]

     *Montanye* illustrates the point. The Second Circuit there found state action where, at the request of the police, a private employer conducted a polygraph examination of a murder suspect and carried a concealed transmitter so that investigators in an adjoining room could hear and record the examination.[102] The Court explained that

> "[t]he controlling factor is . . . the fact that the state had involved itself in the use of a substantial economic threat to coerce a person into furnishing an incriminating statement. Nor do we perceive any consequence flowing from the fact that the threat in the present case was conveyed through a private employer, admittedly acting as an agent for the police, rather than through a person on the public payroll. The state's involvement is no less real for having been indirect and no less impermissible for having been concealed. The state is prohibited in either event from compelling a statement through economically coercive means, whether they are direct or indirect."[103]

     Here, the government quite deliberately precipitated KPMG's use of economic threats to coerce the proffer statements in question. "KPMG's decision to cut off all payments of legal fees and expenses to anyone who was indicted and to limit and to condition such payments prior to indictment upon cooperation with the government was the direct consequence of the pressure applied by the Thompson Memorandum and the USAO."[104] The Thompson Memorandum, moreover, made it clear that a company's failure to ensure that its employees disclose whatever they knew, regardless of their individual rights and concerns, might weigh in favor of indicting the

---

[101]     *Id.*

[102]     500 F.2d at 415.

[103]     *Id.*

[104]     2006 WL 1735260 at *14.

company.  The USAO knew that KPMG would apply additional pressure, beyond the threatened cut-off of legal fees, to "uncooperative" employees.  Indeed, it reported them to KPMG in circumstances in which there was no conceivable reason for doing so except to facilitate the firing threats that ensued.

The government nevertheless argues that KPMG was purely a private actor.  It relies on cases holding that actions of organizations in the securities and in other heavily-regulated industries are not attributable to the government.  But it misconceives the thrust of those cases and understates the extent of its involvement in KPMG's actions.

It places heaviest reliance on *United States v. Solomon,*[105] which upheld receipt in a criminal trial of statements made by an officer of a brokerage firm during a New York Stock Exchange ("NYSE") disciplinary inquiry on the ground that the NYSE interrogation was not attributable to the government despite the heavily regulated nature of the securities industry.  The crux of the decision was this:

> "Solomon argues that . . . interrogation by NYSE must be deemed the equivalent of interrogation by the United States because the Exchange has become in effect the arm of the Government in administering portions of the Securities Exchange Act.  He relies upon various provisions of the Act, such as the reporting requirements of § 17(a) and the regulations thereunder and the many other powers over exchanges and their members conferred on the SEC by § 19(a), (b) . . . Particular emphasis is placed on Silver v. New York Stock Exchange, 373 U.S. 341, 350-53, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963), where, after discussing the proved inadequacies of 'ungoverned self-regulation' by the exchanges and the consequent need for government supervision, the Court said:
>
> > "The pattern of governmental entry [into securities regulation], however, was by no means one of total displacement of the exchanges' traditional process of self-regulation.  The intention was rather, as Mr. Justice

---

[105] 509 F.2d 863 (2d Cir. 1975).

Douglas said, while Chairman of the S.E.C., one of 'letting the exchanges take the leadership with Government playing a residual role. Government would keep the shotgun, so to speak, behind the door, leaded, well oiled, cleaned, ready for use but with the hope it would never have to be used.' Douglas, Democracy and Finance (Allen ed. 1940), 82. Thus the Senate Committee Report stressed that 'the initiative and responsibility for promulgating regulations pertaining to the administration of their ordinary affairs remain with the exchanges themselves. It is only where they fail adequately to provide protection to investors that the Commission is authorized to step in and compel them to do so.' S.Rep. No. 792, supra, at 13. The House Committee Report added the hope that the bill would give the exchanges sufficient power to reform themselves without intervention by the Commission. H.R.Rep. No. 1383, supra, at 15. See also 2 Loss, Securities Regulation(2d ed. 1961), 1175, 1178, 1180-1182.

"Thus arose the federally mandated duty of self-policing by exchanges.

"Solomon misconceives the thrust of the Act and the Court's discussion of it. The exchanges' 'traditional process of self-regulation' was not displaced. See H.R.Rep. No. 1383, 73d Cong., 2d Sess. 15 (1934); S.Rep. No. 792, 73d Cong., 2d Sess. 13 (1934) (stressing the broad responsibility left with the exchanges to administer their own affairs). Rather the SEC was given the power and the duty to make sure that the responsibility was diligently and effectively used. See Gordon v. New York Stock Exchange, supra, 498 F.2d at 1306-1307, and sources cited therein. NYSE's inquiry . . . was in pursuance of its own interests and obligations, not as an agent of the SEC. It is not enough to create an agency relationship that Solomon's conduct violated both a rule of NYSE, thereby subjecting him to disciplinary action by that body, and federal law, with consequent liability to civil and criminal enforcement proceedings by the Government."[106]

The distinction between the situation at issue in *Solomon* and its progeny and this case thus is quite clear. The stock exchanges had rules and disciplinary mechanisms to enforce them even before the Securities Exchange Act of 1934 (the "Exchange Act") brought the industry under federal regulation. While the Exchange Act required the exchanges to police themselves, it

---

[106]     *Id.* at 868-69 (footnotes omitted).

expressly left undisturbed their "broad responsibility . . . to administer their own affairs."[107]  The

SEC's role was only to ensure that "the responsibility was diligently and effectively used."[108]  In

consequence, actions by the exchanges in the application of their own regulatory schemes, without

more, are not attributable the government.  There is state action only where there is "a nexus

between the state and the *specific* conduct" at issue.[109]

This is well-illustrated by *D.L. Cromwell Investments, Inc. v. NASD Regulation,

Inc.,*[110] a case involving the issue whether interrogation by the enforcement division of the NASD

was attributable to the government for Fifth Amendment purposes.  The trial court there did not

accept the assertion that the SEC's Exchange Act role with respect to securities industry self-

regulatory organizations alone was sufficient to render the NASD's inquiry state action.  But it

undertook a detailed examination of the extent to which that inquiry was prompted or controlled by

the USAO or the SEC.  It rejected the plaintiffs' claim only after concluding that government

agencies were not implicated in the specific NASD actions at issue.[111]

This is an entirely different situation.  The Moving Defendants do not here rely on

a pattern of industry regulation.  Rather, they point to the Thompson Memorandum, which quite

specifically tells a company under investigation, as was KPMG, that a failure to ensure that its

employees tell prosecutors what they know may contribute to a decision to indict and, in this case,

---

[107]     *Id.* at 869.

[108]     *Id.*

[109]     *Desiderio,* 191 F.3d at 207 (emphasis in original).

[110]
          279 F.3d 155 (2d Cir. 2002).

[111]
          132 F. Supp.2d 248, 251-53 (S.D.N.Y. 2001),  *aff'd,* 279 F.3d 155 (2002).

likely destroy the company. And they point also to the USAO's close involvement in KPMG's decision making process by, among other things, pointedly reminding KPMG that it would consider the Thompson Memorandum in deciding whether to indict, saying that payment of employee legal fees would be viewed "under a microscope," and reporting to KPMG the identities of employees who refused to make statements in circumstances in which the USAO knew full well that KPMG would pressure them to talk to prosecutors.

The ultimate question here is whether "the state 'has exercised coercive power [over a private decision] or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State.'"[112] This Court finds that the government, both through the Thompson Memorandum and the actions of the USAO, quite deliberately coerced, and in any case significantly encouraged, KPMG to pressure its employees to surrender their Fifth Amendment rights. There is a clear nexus between the government "and the *specific* conduct of which" the Moving Defendants complain.[113] KPMG's actions in this regard are "fairly attributable" to the United States.[114]

---

[112]     *Cromwell*, 279 F.3d at 161 (quoting *Blum*, 457 U.S. at 1004-05).

[113]     *Desiderio*, 191 F.3d at 207 (emphasis in original).

[114]     The DOJ now takes the position that the making of false statements to private attorneys representing corporations that are under investigation and cooperating with the government may constitute obstruction of justice under 18 U.S.C. § 1512(c)(2), evidently on the theory that misstatements and omissions to those cooperating with government investigations can "obstruct[] . . . an official proceeding." Indictment ¶¶ 51-59, 75-79, *United States v. Kumar,* Cr. No. 04 Cr. 0846 (E.D.N.Y. filed Sept.20, 2004); *see also* U.S. Dept. of Justice, *Former Computer Associates Executives Indicted on Securities Fraud, Obstruction Charges* (Sept. 22, 2004) (available at http://www.usdoj.gov/opa/pr/2004/September/04_crm_642.htm) (last visited July 25, 2006). There is more than a little tension between its assertion that the acts of companies cooperating with it are not state action when the cooperator is induced to coerce third parties for the government's benefit but are sufficiently related to government action that

*Conclusion*

Many companies faced with allegations of wrongdoing are under intense pressure to avoid indictment, as an indictment – especially of a financial services firm – threatens to destroy the business regardless of whether the firm ultimately is convicted or acquitted. That is precisely what happened to Arthur Andersen & Co., one of the world's largest accounting firms, which collapsed almost immediately after it was indicted – and the Supreme Court's eventual reversal of its conviction did not undo the damage. So any entity facing such catastrophic consequences[115] must do whatever it can to avoid indictment.

The DOJ and other federal agencies have capitalized on this, in part by altering the manner in which suspected corporate crime has been investigated, prosecuted, and, when proven, punished. The Thompson Memorandum is a part of this change. In cases involving vulnerable companies, the pressure exerted by it and by the prosecutors who apply it inevitably sets in motion precisely what occurred here – the exertion of enormous economic power by the employer upon its employees to sacrifice their constitutional rights.

In this case, the pressure that was exerted on the Moving Defendants was a product of intentional government action. The government brandished a big stick – it threatened to indict KPMG. And it held out a very large carrot. It offered KPMG the hope of avoiding the fate of Arthur Andersen if KPMG could deliver to the USAO employees who would talk, notwithstanding their

---

obstruction of the cooperator obstructs the government.

[115] An indictment is not life-threatening for all companies in all circumstances. Some privately-held companies, for example, might well be able to survive. Here, however, it is undisputed that an indictment would have been at least a serious threat to the continued viability of KPMG, just as it was fatal to Arthur Andersen.

constitutional right to remain silent, and strip those employees of economic means of defending themselves. In two instances, that pressure resulted in statements that otherwise would not have been made. In seven, the evidence does not warrant that conclusion. The coerced statements and their fruits must be suppressed.

It is no answer for the government to say that these aspects of the Thompson Memorandum are needed to fight corporate crime. Those responsible should be prosecuted and, if convicted, punished. But the end does not justify the means.

Accordingly, the motion is granted to the extent that the statements made by defendant Richard Smith and by defendant Mark Watson on April 13 and September 9, 2004, and the fruits thereof are suppressed. It is denied in all other respects.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

Dated:          July 25, 2006

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)